UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                  :

FRANK VASSALLO,              :
                  :

           Plaintiff,  :

                  :

        v.          :
                  :

CITY OF NEW YORK, CORIZON HEALTH, :
INC., CORIZON, INC., NEW YORK CITY  :
HEALTH AND HOSPITALS CORPORATION, :
NEW YORK CITY DEPARTMENT OF   :
CORRECTION COMMISSIONER JOSEPH  :
PONTE, CHIEF OF DEPARTMENT MARTIN :
MURPHY, DEPUTY COMMISSIONER OF  :
OPERATIONS DR. ERROL TOULON, JR.,  :
MANHATTAN DETENTION COMPLEX   :
WARDEN RALEEM MOSES, BELLEVUE  :
HOSPITAL PRISON WARD DEPUTY    :
WARDEN IN COMMAND DANIEL     :
O'CONNELL, JOHN/JANE DOES 1-50,  :
                  :

          Defendants. :
                  :
------------------------------------------------------ X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #: _____**
**DATE FILED: November 22, 2016**

15 Civ. 7125 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Frank Vassallo, a diabetic former inmate at the Manhattan

Detention Center ("MDC") and Bellevue Hospital Center's Prison Ward ("BPW"),

brings this action under 42 U.S.C. § 1983, alleging deliberate indifference to

his medical needs in violation of the Eighth and Fourteenth Amendments.

Various defendants employed by the City of New York (the "City Defendants")

and the New York City Health and Hospitals Corporation ("HHC") have filed two

motions to dismiss Plaintiff's Amended Complaint (the "FAC") under Federal

Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the City

Defendants' motion is granted in part and denied in part, and HHC's motion is granted.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Incarceration at MDC

The FAC alleges the following facts for the period from December 19, 2014, to December 21, 2014, during which Plaintiff was incarcerated at MDC (the "MDC Period"):  On December 19, 2014, Plaintiff was taken into Department of Correction ("DOC") custody for failure to pay child support by Order of Commitment of the Richmond County Family Court.  (FAC ¶ 64).  The Order directed DOC "to [e]nsure that [Plaintiff] receive all appropriate medical attention and be given all prescribed medications."  (*Id.* at ¶ 65).  At the time Plaintiff was taken into custody, he was "a well-cared for diabetic, receiving regular insulin via his insulin pump, receiving boluses as required, and not suffering from any foot ulcerations, cellulitis, or infection."  (*Id.* at ¶ 67).  DOC designated Plaintiff for housing at MDC.  (*Id.* at ¶ 66).

In the early morning hours of December 20, 2014, Plaintiff was interviewed by medical intake personnel at MDC about his social, mental health, and medical histories.  (FAC ¶ 68).  As part of his medical history

---

[1]      This Opinion draws on facts from the Amended Complaint ("FAC", Dkt. #42), which facts are taken as true for purposes of this motion.  *See Faber* v. *Metro. Life Ins. Co.,* 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  For convenience, the City Defendants' moving brief is referred to as "City Br." (Dkt. #50); HHC's moving brief as "HHC Br." (Dkt. #48); Plaintiff's brief in joint opposition as "Pl. Opp." (Dkt. #56); the City Defendants' reply as "City Reply" (Dkt. #58); and HHC's reply as "HHC Reply" (Dkt. #57).

interview, Plaintiff informed personnel that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, which he was wearing at that time, and which automatically monitors his blood sugar and provides insulin throughout the day; (iii) he had run out of his insulin after being taken into custody but prior to the intake; (iv) he requires a special diabetic diet; (v) he was experiencing swelling in his lower extremities and burning pain at a level of 9 out of 10; and (vi) he was starting to feel sluggish and experiencing other effects of high blood sugar (collectively referred to herein as the "Health Disclosure").  (*Id.*).

At this time, Plaintiff requested an insulin refill for his pump, but was informed that DOC policy would not permit him to continue using the pump while in custody.  (FAC ¶ 69).  He was also told that MDC clinic medical staff would give him insulin shots instead.  (*Id.*).  Plaintiff was not given any insulin or food at the time of his intake.  (*Id.*).  He submitted to a urine drug screen and was then returned to the intake cell to await his housing assignment.  (*Id.*).  Several hours later, Plaintiff was taken from the intake cell to the MDC clinic, where he repeated the Health Disclosure that he had provided at intake; he also requested insulin.  (*Id.* at ¶ 70).  A finger stick test was taken and revealed that Plaintiff's blood sugar was 189 mg/dl.[2]  (*Id.*).  Plaintiff was still not given any insulin or food at that time.  (*Id.*).

---

[2]     In an effort to be comprehensive, Plaintiff includes considerable detail in the FAC regarding his blood chemistry during the period of his confinement, including, for example, his hemoglobin A1C levels and milligrams of glucose per deciliter of blood (mg/dl).  (*See, e.g.,* FAC ¶¶ 70, 72, 87-88).  Plaintiff also alleges the appropriate blood sugar levels for a "well-managed" diabetic.  (*See id.* at ¶ 85 (alleging that diabetic's blood sugar before meals should be between 70 and 130 mg/dl; two hours after meals, should

Plaintiff was next questioned by an individual whom he believed to be a physician, and repeated his Health Disclosure to this individual.  (FAC ¶ 71).  Plaintiff also showed the individual a letter from his treating physician, which confirmed Plaintiff's diabetic condition and his need for an insulin pump.  (*Id.*).  Plaintiff again requested insulin, but was provided no insulin either through a pump refill or a shot.  (*Id.*).  He was also not given any food at this time.  (*Id.*).

At approximately 12:36 p.m. on December 20, 2014, nearly 24 hours after Plaintiff was received into custody, MDC medical personnel performed a physical examination, including a blood test, on Plaintiff.  (FAC ¶ 72).  MDC medical personnel — including Charles Appiah, RPA, Curt Walker, PA, and Jeanne Israel, RN — tested Plaintiff's hemoglobin A1C, which was found to be 12.6%.  (*Id.*).  The FAC alleges that such a level is "nearly double the goal for fasting diabetics," and indicates that Plaintiff was "at a significantly heightened risk for developing diabetes-related complications such as kidney failure, blindness and neuropathy."  (*Id.*).  Plaintiff's blood sugar at that time was 150 mg/dl.  (*Id.*).  Plaintiff was given four medications (omeprazole, lisinopril, hydrochlorothiazide, and simvastatin) to treat his cholesterol, high blood pressure, and gastric reflux conditions; however, Plaintiff was provided no insulin or medication to manage his diabetes.  (*Id.*).

---

be less than 180 mg/dl; and at bedtime, should be between 90 to 130 mg/dl)).  This level of medical detail is usually presented and considered at the summary judgment stage, not on the pleadings.  This Court's review of other courts' treatment of such medical details at the pleadings stage has not revealed perfect consistency in that treatment.  The Court has considered Plaintiff's blood chemistry details, but does not believe that, in light of the FAC's overall allegations, the inclusion or exclusion of such details would impact the deliberate indifference analysis in this Opinion.

Mr. Appiah contacted Dr. Tahmina Sikder and requested Plaintiff's transfer to the medical dorm at DOC's North Infirmary Command ("NIC"), which the FAC alleges "houses and is better equipped to treat detainees with similar medical conditions, for insulin pump management." (FAC ¶ 73). Although Plaintiff was initially accepted into the NIC medical dorm, his admission was later rescinded because DOC policy allegedly did not permit Plaintiff to be housed at NIC due to his status as a civilly confined prisoner. (*Id.*). Because Plaintiff's medical needs could not be met at MDC, the FAC alleges, Plaintiff was slated for transfer to BPW. (*Id.* at ¶ 74).

On December 21, 2014, DOC officers were tasked with transporting Plaintiff from MDC to BPW and commenced the transport; however, upon reaching BPW, the officers were informed by medical staff that "more was required of them than their anticipated '3 hour hospital run.'" (FAC ¶ 76). The FAC alleges that because it was near the end of the officers' shift, rather than wait and admit Plaintiff into BPW, the officers returned Plaintiff to MDC in order for officers from the following shift to transport Plaintiff back to BPW. (*Id.*). Plaintiff was not examined or treated by any medical personnel at BPW before officers returned him to MDC for the next shift's transport. (*Id.*).

Several hours later, Plaintiff was returned to BPW, where he was admitted through the emergency department and transferred to the prison ward. (FAC ¶ 77). At the emergency room, Plaintiff was found to be "hypoglycemic with his blood sugar below 40 mg/dl." (*Id.*) The FAC notes that,

prior to that day, Plaintiff had never been hospitalized for his diabetes.  (*Id.* at ¶ 78).

In short, Plaintiff received no insulin, food, or diabetes medication from the time of his admission to MDC on December 19, 2014, through the time of his transfer to BPW on the evening of December 21, 2014.  (FAC ¶¶ 72, 75, 106-07).

### 2.    Plaintiff's Incarceration at BPW

The FAC alleges the following facts for the period from December 21, 2014, to January 14, 2015, during which Plaintiff was in custody at BPW (the "BPW Period"):

### a.    Plaintiff's Admission to BPW and Initial Care

Upon Plaintiff's December 21, 2014 admission to BPW, staff conducted a medical and social history intake, during which Plaintiff conveyed the name and contact number for his treating physician, as well as the facts that: (i) he has had Type I diabetes since 1995; (ii) he has been prescribed and has used an insulin pump since 2005, but ran out and the MDC medical staff had refused to refill it; (iii) he had not received any insulin while at MDC; (iv) he had not had a meal since December 19, 2014; and (v) during the intake he was feeling sweaty and experiencing swelling in his lower extremities with burning pain.  (FAC ¶ 79).  These symptoms are alleged to be well-known complications from elevated blood sugar levels.  (*Id.*).  Plaintiff was told that DOC policy forbids BPW from refilling his insulin pump and that he would be given insulin

shots instead.  (*Id.* at ¶ 80).  Plaintiff was not given any insulin or food at that time.  (*Id.*).

About four hours after his admission to BPW, at approximately 10:13 p.m. on December 21, 2014, Plaintiff was provided juice and his first meal since his December 19, 2014 admission into MDC; this "made him feel better for the moment."  (FAC ¶ 82).  About an hour later, Plaintiff reported to his nurse that he was experiencing bilateral foot and leg pain at an 8 out of 10 intensity; upon examination, Plaintiff was confirmed to have bilateral leg swelling, which was worse in his left leg.  (*Id.* at ¶ 83).  Plaintiff again reported severe throbbing pain about 40 minutes later.  (*Id.*).

At 10:40 p.m. on December 22, 2014, Plaintiff's blood sugar was tested and found to be 311 mg/dl.  (FAC ¶ 87).  In response, BPW medical personnel gave Plaintiff long-acting insulin, but failed to give him any short-acting insulin to bring his sugar down quickly; consequently, by 11:19 p.m. on the same evening, Plaintiff's blood sugar rose to 588 mg/dl, but personnel took no action.  (*Id.*).  Nearly nine hours later, at 7:45 a.m. on December 23, 2014, BPW medical personnel re-checked Plaintiff's blood sugar, which was found still to be over 450 mg/dl.  (*Id.* at ¶ 88).  At that point, personnel provided Plaintiff with short-term insulin instead of a sliding scale.  (*Id.*).  However, as of 9:41 a.m., Plaintiff's blood sugar was still over 450 mg/dl and, by 10:04 a.m., it reached 626 mg/dl.  (*Id.*).

On December 29, 2014, Plaintiff was examined and found to have an "open laceration under [his] right foot" and dry crust under his left foot,

indicative of an underlying ulcer.  (FAC ¶ 91).  Plaintiff had not been receiving treatment for this ailment despite its progressive worsening.  (*Id.*).  Following this exam, Plaintiff was ordered to be provided with special foot appliances for his right foot to offload right foot erosion (and to be worn whenever walking); BPW medical personnel were also directed to advise Plaintiff to remain off his feet; and personnel were to dress Plaintiff's right foot to keep it dry in the shower and to apply lotion topically to his feet.  (FAC ¶ 92).  However, Plaintiff was not provided with these foot appliances or dressings, nor was he advised to stay off his feet.  (*Id.*).  An x-ray of Plaintiff's right foot was performed, which ruled out osteomyelitis, i.e., a bone infection; however, follow-up studies were not ordered or performed during Plaintiff's admission.  (*Id.*).

### b.    Plaintiff's Consultations with Specialists

On January 3, 2015, endocrinologist Nidhi Agrawal, M.D., consulted with Plaintiff regarding the ulcers and swelling of his feet.  (FAC ¶ 93).  Dr. Agrawal reviewed Plaintiff's medication history, blood sugar levels since admission, and lab results, but did not physically examine Plaintiff.  (*Id.*).  Dr. Agrawal advised medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers"; however, no such consultation was requested.  (*Id.*).

Two days later, Dr. Agrawal returned due to increased swelling of Plaintiff's legs and for evaluation of a plantar ulcer on Plaintiff's right foot, along with two smaller ulcers on the heel and ball of the foot.  (FAC ¶ 94). Erythematous areas were found over both legs with pitting edema, which the FAC alleges are indicative of infection.  (*Id.*).  Again, Dr. Agrawal advised

medical staff to "[c]onsider vascular surgery consult for diabetic foot ulcers";
however, no such consultation was requested. (*Id.*).  Despite several endocrinal
consultations, Plaintiff's hyperglycemia was never controlled and "would range
from the 40s to 600s." (*Id.* at ¶ 95).

On January 9, 2015, Plaintiff was examined by podiatrist Eric Nelson,
M.D., who found plantar ulcerations and fissures on Plaintiff's feet. (FAC
¶¶ 96-97).  Plaintiff reported that he felt no sensation in his feet and was
worried about infection. (*Id.* at ¶ 97).  Dr. Nelson determined that the
ulcerations on both feet were not infected and that the right foot "ulceration is
secondary to uncontrolled diabetes w/ peripheral neuropathy." (*Id.* at ¶ 97).
Dr. Nelson directed that Plaintiff's right foot be kept elevated and that his
dressings be changed daily with an antiseptic, but Plaintiff's right foot was not
kept elevated by BPW medical personnel, nor were his dressings changed daily.
(*Id.*).

On January 14, 2015, Plaintiff was examined by dermatologist Shields
Callahan, M.D., who found Plaintiff with a two-to-three-centimeter ulcer at the
base of his right second toe, with granulation tissue at the base and without an
active infection. (FAC ¶ 98).  Plaintiff's left foot had linear deep fissures on
plantar surfaces, also without an active infection. (*Id.*).

Later the same day, podiatrist Mariola Morell, M.D., examined Plaintiff
and made further recommendations regarding foot care for Plaintiff; however,
Plaintiff was discharged from BPW later that evening. (FAC ¶ 99).

### 3.      Plaintiff's Discharge from BPW and Subsequent Medical Care

On January 14, 2015, Plaintiff was discharged from BPW and released from DOC custody, after having petitioned the Family Court for compassionate release due to inadequate medical care and complications arising from diabetes.  (FAC ¶ 100).

The next day, Plaintiff was examined by his own doctor, who diagnosed Plaintiff with an infection, started him on a course of antibiotics, and scheduled him for an MRI to determine whether the infection had reached the bone.  (FAC ¶ 103).  While the infection did not reach the bone and Plaintiff's foot did not require amputation, "the infection was so prevalent" that, approximately five weeks later, on February 24, 2015, "Plaintiff underwent surgery to excise the infection and skin graft the wound."  (*Id.*).

On February 24, 2015, prior to the surgery, a tissue sample was taken of the infected area.  (FAC ¶ 104).  Plaintiff was later advised that he had "contracted a hospital-borne infection — methicillin-resistant staphylococcus aureus (MRSA) — at BPW."  (*Id.*).  Tissue samples were never taken during Plaintiff's detention at BPW and he was never treated there for MRSA.  (*Id.*).

## B.      Procedural Background

On March 10, 2015, Plaintiff filed a Notice of Claim with the City of New York, and on March 11, 2015, Plaintiff filed a Notice of Claim with HHC.  (FAC ¶¶ 112-13).  HHC held its statutory hearing on May 14, 2015, and the City its statutory hearing on July 6, 2015.  (*Id.* at ¶¶ 115-16).

Plaintiff filed the Complaint in this action on September 10, 2015. (Dkt. #1). HHC filed a pre-motion letter on October 29, 2015 (Dkt. #35), to which Plaintiff responded on November 3, 2015 (Dkt. #36). The Court held a joint Initial Pretrial Conference and Pre-Motion Conference on November 17, 2015 (*see* Dkt. #40), at which the City Defendants appeared and also sought leave to move to dismiss (*see* Tr. of Nov. 17, 2015 Pre-Motion Conf., Dkt. #40, at 17:7-23). The Court issued an Order on the same day that, *inter alia*, directed Defendants to produce Plaintiff's medical records, and set a scheduling for amending the Complaint and for motion practice. (*See* Dkt. #39).

Plaintiff filed the FAC on January 29, 2016 (Dkt. #42), naming: (i) the City of New York (the "City"); Corizon Health, Inc. and Corizon, Inc. (together, "Corizon"); Joseph Ponte; Martin Murphy; Errol Toulon; Raleem Moses; Daniel O'Connell; John and Jane Doe healthcare workers and medical staff at MDC, and John and Jane Doe DOC officials (collectively, with the City and Corizon, the "City Defendants"); and (ii) the New York City Health and Hospitals Corporation, and certain John and Jane Doe healthcare workers and medical staff at BPW (collectively, "HHC").

On March 8, 2016, HHC filed a motion to dismiss and memorandum in support thereof, and the City Defendants did the same on the following day. (Dkt. #46-50). On April 6, 2016, Plaintiff filed a memorandum jointly opposing Defendants' motions to dismiss. (Dkt. #55-56). Defendants filed their reply memoranda on April 19, 2016. (Dkt. #57-58).

11

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## 2.   Materials That May Be Considered in Resolving a Motion Under Rule 12(b)(6)

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)); *see generally Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a motion to dismiss).

HHC argues for the first time in its Reply Brief that "Plaintiff has made his medical records an integral part of his Complaint," and urges the Court to consider those records, an electronic copy of which HHC has submitted, in connection with resolving the present motions or, alternatively, in converting the present motions practice into one for summary judgment. (*See* HHC Reply 2-3). The Court declines to consider Plaintiff's medical records in resolving the instant motions. For starters, HHC's medical records argument is raised for the first time in reply, despite the fact that it could and should have been made in its opening brief. Although the Court has discretion to consider arguments raised for the first time in reply, it is also "free to disregard" them.

*Am. Hotel Int'l Grp., Inc.* v. *OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375

(S.D.N.Y. 2009); *Playboy Enters., Inc.* v. *Dumas*, 960 F. Supp. 710, 720 n.7

(S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be

considered by a court.").

Moreover, the medical records here are neither "attached to the

complaint as exhibits," nor "incorporated by reference in the complaint."

*DiFolco*, 622 F.3d at 111. Although the Court "*may* nevertheless consider [the

medical records] where the complaint relies heavily upon its terms and effect,

which renders the document integral to the complaint," *Chambers*, 282 F.3d at

153 (emphasis added) (internal quotation marks omitted), upon reviewing the

FAC, the Court finds this not to be the case and, in any event, declines to

consider the records at this stage. *See Goel*, 820 F.3d at 559 ("Merely

mentioning a document in the complaint will not satisfy this standard; indeed,

even offering limited quotations from the document is not enough." (internal

quotation marks and alterations omitted)).

### 3.   Section 1983 Claims Generally

Section 1983 establishes liability for deprivation, under color of state

law, "of any rights, privileges, or immunities secured by the Constitution[.]" 42

U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the

badge of their authority to deprive individuals of their federally guaranteed

rights and to provide relief to victims if such deterrence fails." *Wyatt* v. *Cole*,

504 U.S. 158, 161 (1992). As such, a § 1983 claim "has two essential

elements: [i] the defendant acted under color of state law; and [ii] as a result of

14

the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

As a prerequisite to an award of damages under § 1983, a plaintiff must show the personal involvement of defendants in the alleged constitutional deprivations. *See Farid* v. *Ellen,* 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555).

### 4.    Section 1983 Claims for Deliberate Indifference

To plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege facts that satisfy (i) an objective requirement that the alleged deprivation results in a serious medical condition and (ii) a subjective requirement that the defendant, in depriving the plaintiff of medical treatment, acted with deliberate indifference. *See Caiozzo* v. *Koreman*, 581 F.3d 63, 72 (2d Cir. 2009); *id.* (holding that deliberate indifference to medical need claims "of a person in custody should be analyzed under the same standard irrespective of whether they are brought" under the

Eighth Amendment (for convicted detainees) or Fourteenth Amendment (for pretrial detainees)).[3]

With respect to the subjective element, a plaintiff must allege that the defendant acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway* v. *Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citation omitted). Such a state of mind "entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 835 (1994)) (internal quotation marks omitted).

Mere allegations of negligence will generally be insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle* v. *Gamble*, 429 U.S. 97, 105-06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, a plaintiff must allege that "the charged official … act[ed] or fail[ed] to act while *actually aware* of a substantial risk that serious inmate harm will

---

[3]     The Second Circuit has not indicated post-*Caiozzo* whether a different standard applies in the civil detention setting presented here. *Cf. Calhoun* v. *Umeasor*, No. 12 Civ. 7238 (AJN), 2014 WL 1229592, at *3 (S.D.N.Y. Mar. 21, 2014) (finding that *Caiozzo* obviated the need, when conducting a deliberate indifference to medical needs analysis, to resolve the factual issue of whether the plaintiff was criminally or civilly confined); *accord James* v. *Kaskiw*, No. 13 Civ. 526 (DNH), 2014 WL 3845086, at *3 (N.D.N.Y. Aug. 5, 2014). Nor does Plaintiff argue for a different standard based on his civil detention. (*See* FAC ¶¶ 9, 127, 152; Pl. Opp. 12-20). In light of *Caiozzo*'s holding, and for ease of reference, this Opinion refers only to the Eighth Amendment deliberate indifference framework, while recognizing that Plaintiff raises his deliberate indifference claim under both the Eighth and Fourteenth Amendments. (*See id.*).

result." *Bell* v. *Jendell*, 980 F. Supp. 2d 555, 561 (S.D.N.Y. 2013) (quoting *Salahuddin* v. *Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks omitted) (emphasis in *Bell*)); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Accordingly, "not every lapse in medical care is a constitutional wrong." *Salahuddin*, 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference. *See Ross* v. *Correct Care Sols. LLC*, No. 11 Civ. 8542 (DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013).

**B.    Analysis**

    **1.    Plaintiff Adequately Pleads a Claim of Deliberate Indifference as to the MDC Period, But Not as to the BPW Period**

        **a.    The Objective Element Is Satisfied as to Both the MDC and the BPW Periods**

The City Defendants argue that Plaintiff's claim, properly construed, is not for the total deprivation of medical care, but rather for delayed or inadequate medical care. (*See* City Br. 9). Therefore, the City Defendants maintain, the seriousness inquiry under the objective element should be focused only on the unreasonableness of the delay or inadequacy rather than on the severity of Plaintiff's underlying condition. (*Id.* at 9-10). HHC argues

that, as to the BPW period, Plaintiff was neither deprived of medical care nor provided delayed or inadequate care and, accordingly, Plaintiff's claims fail to satisfy the objective element.  (*See* HHC Br. 9-12).

The Second Circuit advises district courts that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries.  The first inquiry is whether the prisoner was actually deprived of adequate medical care ….  Second, the objective test asks whether the inadequacy in medical care is sufficiently serious.  This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin*, 467 F.3d at 279-80.  "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious."  *Id.* (citing *Smith* v. *Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  Where, however, the inadequacy is in the medical treatment given, "the seriousness inquiry is narrower."  *Id.* at 280.  For example, if the offending conduct is an unreasonable delay or interruption in treatment, "the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'"  *Id.* (quoting *Smith*, 316 F.3d at 185) (alterations omitted).  In such scenarios, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  *Smith*, 316 F.3d at 186.

The City Defendants are incorrect that Plaintiff fails to raise a claim for the total deprivation of medical care as to the MDC Period.  The FAC makes clear that despite Plaintiff's repeated declarations to MDC personnel that he suffers from diabetes and was experiencing its painful symptoms, he was deprived of food, insulin, and diabetes medication during the entirety of the MDC Period.  (*See* FAC ¶¶ 68, 70-72, 75, 106-07).  Provision of medicine for Plaintiff's unrelated medical needs, such as cholesterol, blood pressure, and gastric reflux (*see id.* at ¶ 72), does nothing to negate Plaintiff's allegations about a complete lack of care for his diabetes, the medical condition on which his claims are based.  *See Smith*, 316 F.3d at 185-86 ("There is no need to distinguish between a prisoner's underlying 'serious medical condition' and the circumstances of his 'serious medical need' when the prisoner alleges that prison officials have failed to provide general treatment for his medical condition.").  As to the BPW Period, however, the FAC may be construed as raising claims based on delayed or inadequate care.  (*See, e.g.,* FAC ¶ 84 (alleging that at BPW, Plaintiff's "blood sugar was not tested with regular frequency nor was insulin regularly provided."); *id.* at ¶ 87 ("Plaintiff should have been receiving long-acting insulin rather than by sliding scale, as BPW personnel administered."); *id.* at ¶ 90 (alleging delayed podiatry consultation and surgical evaluation of Plaintiff's foot)).

The Court finds that Plaintiff's allegations concerning both the MDC Period and the BPW Period state claims that satisfy the objective element of the deliberate indifference analysis.  Plaintiff's diabetes is a sufficiently serious

medical condition: a reasonable doctor or patient would find it "important and worthy of comment"; the condition "significantly affects an individual's daily activities"; and it can cause "chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (citing *Chance* v. *Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotation marks omitted); *see also Beatty* v. *Davidson*, 713 F. Supp. 2d 167, 174 (W.D.N.Y. 2010) ("This Court need not linger on this point: diabetes is a sufficiently serious medical condition to meet the objective prong.") (collecting cases); *Colon* v. *County of Nassau*, No. 12 Civ. 4466 (JS), 2014 WL 4904692, at *6 (E.D.N.Y. Sept. 26, 2014) (recognizing that "[c]ourts in this Circuit have held that diabetes is a sufficiently serious medical condition to meet the objective prong of a deliberate indifference claim" (internal quotation marks omitted)).

Even under a narrower seriousness inquiry that focuses on "the particular risk of harm" faced by Plaintiff due to delayed or inadequate treatment during the BPW Period, *see Smith*, 316 F.3d at 186, the objective element is met. The FAC alleges infrequent blood sugar monitoring and insulin provision (*see, e.g.,* FAC ¶¶ 84, 88), inadequate insulin treatments (*see, e.g., id.* at ¶ 88), and delayed or inadequate treatment by specialists (*see, e.g., id.* at ¶¶ 90, 93-94, 96), allegedly resulting in consistently and abnormally elevated blood sugar levels (*see id.* at ¶¶ 86-88), and other diabetes-related complications (*see id.* at ¶¶ 92-93). (*See also* Pl. Opp. 17 ("Plaintiff is not alleging that there were short-term delays and inadequacies of treatment surrounded by otherwise acceptable care, but rather that there were short-

term provisions of inadequate care surrounded by otherwise non-existent and/or cursory care.")).  These allegations of harm are sufficiently serious, not "minor and inconsequential."  *Smith* at 186; *see id* ("For example, the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment."); *see also Roberts* v. *C-73 Med. Dir.*, No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *5 (S.D.N.Y. July 13, 2015) (finding that allegations of delayed diabetes treatment and resulting pain satisfied objective element of deliberate indifference analysis); *Ferguson* v. *Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (recognizing that "[w]here temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness").

In sum, Plaintiff has plausibly pled that his underlying medical condition and the risk of (and actual) harm incurred due to delayed or inadequate care were sufficiently serious to satisfy the Eighth Amendment's objective element for both the MDC and the BPW Periods.

### b.    The Subjective Element Is Satisfied as to the MDC Period But Not as to the BPW Period

#### i.    The MDC Period

Satisfaction of the objective element is, of course, only half of the inquiry. The City Defendants further argue that the FAC's allegations fail to satisfy the

21

subjective element of the Eighth Amendment analysis.  (*See* City Br. 10).
Specifically, they contend that Plaintiff pleads no facts from which it can be
inferred that "any of the MDC staff he encountered knew of and disregarded an
excessive risk to his health or safety." (*Id.* at 11).  In support of this argument,
the City Defendants point out that, "[i]n the short time he was at MDC, Plaintiff
was seen and evaluated by multiple medical staff members, had his blood
sugar level tested, was prescribed several medications, and was promptly
directed to be transferred to [BPW] for the very purpose of ensuring ... that
Plaintiff receive 'continual medical care.'" (*Id.* at 11 (quoting FAC ¶ 74)).
Furthermore, Plaintiff's allegations about the aborted initial transfer to BPW
"raise no inference that the officers delayed with actual knowledge that the
delay would result in serious harm" (*id.*), while his allegations about being
deprived of food are vague and not sufficiently injurious (*id.* at 12).

        These arguments are unpersuasive.  Plaintiff has pled sufficient facts to
claim plausibly that at least certain of the City Defendants acted with culpable
recklessness; specifically, that MDC personnel knew of and disregarded an
excessive risk to Plaintiff's health.  *See Hill* v. *Curcione*, 657 F.3d 116, 122 (2d
Cir. 2011) (the official must "'know[ ] of and disregard[ ] an excessive risk to
inmate health or safety; the official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm exists, and he
must also draw the inference.'" (quoting *Farmer*, 511 U.S. at 837)).

        In *Washington* v. *Westchester County Department of Correction*, this Court
found allegations supporting an analogous deliberate indifference claim to be

insufficient because that complaint lacked details regarding "(i) whether [the plaintiff] was in pain or exhibited symptoms [when he was first detained]; (ii) whether Defendants were aware that Plaintiff ... had symptoms of [his medical condition] at the time of his incarceration; and (iii) whether Defendants ignored such symptoms or deliberately withheld medication."  No. 13 Civ. 5322 (KPF), 2015 WL 408941, at *8 (S.D.N.Y. Jan. 30, 2015) (internal quotation marks omitted).  Here, by contrast, Plaintiff informed MDC personnel both at his initial intake, and repeatedly thereafter, that he suffers from diabetes; that he was experiencing swelling in his legs and severe burning pain; and that he requires insulin.  (*See, e.g.,* FAC ¶¶ 68-71; *see also id.* at ¶ 71 (alleging that Plaintiff presented letter from his treating physician confirming his diabetic condition and need for insulin).  Plaintiff's physical examination approximately 24 hours into his MDC custody confirmed, according to the FAC, that his diabetes was not being properly treated and that he was "at a significantly heightened risk for developing complications such as kidney failure, blindness and neuropathy."  (*Id.* at ¶ 72).  This led to efforts to transfer Plaintiff to a facility equipped to treat him, but an initial attempt to transfer him to NIC failed due to an alleged DOC policy and the first attempt to transfer him to BPW failed due to DOC officers' alleged malfeasance.  (*Id.* at ¶¶ 73-74, 76).

Despite all of this, during the entirety of Plaintiff's MDC detention — an approximately two-day period concluding with Plaintiff's transfer to BPW — Plaintiff was provided no food, insulin, or diabetes medication.  (*See* FAC ¶¶ 69-72, 75, 106-07).  *See also Washington,* 2015 WL 408941, at *8 ("[C]ertain

medical conditions may be so life-threatening that advising prison personnel of
a diagnosis of that condition and providing corroborative prescriptions may,
particularly at the pleading stage, be sufficient to state a claim of culpable
recklessness if prison officials later fail to act on that knowledge.").

The City Defendants' arguments listed above do not alter this conclusion.
First, the mere fact that Plaintiff was "seen and evaluated by multiple medical
staff members" and "had his blood sugar level tested" (City Br. 11), but
nevertheless received no food, insulin, or diabetes medication over a two-day
period, lends no support to (and, indeed, may affirmatively undermine) the City
Defendants' position that MDC personnel were not deliberately indifferent to
Plaintiff's condition.  Next, the City Defendants' argument that Plaintiff "was
prescribed several medications" while at MDC (*id.* at 11), is a non-starter:
Plaintiff was prescribed medication for cholesterol, blood pressure, and gastric
reflux (*see* FAC ¶ 72); none of these medications was intended to treat
Plaintiff's diabetes (*see id.*), the medical condition upon which Plaintiff's
deliberate indifference claim is based.  Finally, the City Defendants' reliance on
*Inesti* v. *Hogan* for the proposition that the "deprivation of one to two isolated
meals does not amount to a constitutional violation" is misplaced in this
context.  (City Br. 12 (citing *Inesti* v. *Hogan*, No. 11 Civ. 2596 (PAC) (AJP), 2013
WL 791540, at *24-25 (S.D.N.Y. Mar. 5, 2013), *report and recommendation
adopted*, No. 11 Civ. 2596 (PAC), 2013 WL 5677046, at *1 (S.D.N.Y. Sept. 30,
2013))).  Plaintiff's lack of food over an approximately two-day period (*see* FAC
¶ 75), amounts to significantly more than "one or two isolated meals."  And,

more importantly, the *Inesti* inmate was not a diabetic, nor did he claim to suffer from a condition so directly and delicately tied to food intake and blood sugar regulation.  *See Inesti*, 2013 WL 791540, at *1-4, *22-25; *Inesti*, 2013 WL 5677046, at *1 (describing the plaintiff's mental health disorder).  The City Defendants' comparison of denying food to a diabetic versus a non-diabetic is self-evidently flawed.

In sum, the FAC details how MDC personnel were aware of Plaintiff's serious and deteriorating condition, but failed, over approximately two days, to provide any care by means of food, insulin, or diabetes medication.  (FAC ¶¶ 69-72, 75, 106-07).  Taken as a whole, these allegations are sufficient to state a plausible claim that certain of the City Defendants consciously disregarded a substantial risk of serious harm to Plaintiff.  *See Hill*, 657 F.3d at 122; *Chance*, 143 F.3d at 703.

### ii.    The BPW Period

Plaintiff claims that BPW personnel also failed to manage properly his diabetes in multiple respects, including by infrequently monitoring his blood sugar, providing him with the incorrect insulin regimen and untimely specialist care, and neglecting to maintain sanitary conditions, all of which led to numerous diabetes-related complications.  (*See, e.g.,* FAC ¶¶ 83-84, 87, 89, 102).  Plaintiff argues that such inadequate care rises to a constitutional violation because, given the condition in which he arrived at BPW and examinations thereafter, HHC personnel knew that a serious risk of harm to

25

Plaintiff existed, but consciously disregarded that risk by providing only "perfunctory treatment and cursory examinations." (Pl. Opp. 19).

The City Defendants argue that Plaintiff fails to state a claim against them as to the BPW Period, because BPW is owned and operated by co-Defendant HHC, a municipal corporation distinct from the City and Corizon. (*See* City Br. 12). In the alternative, the City Defendants argue that Plaintiff's claim fails on the merits because he received "frequent and consistent medical care," and any criticism to the contrary amounts merely to "disagreements with the care provided" and "at worst, negligence amounting to medical malpractice," but nothing approaching Eighth Amendment deliberate indifference. (City Br. 13-14). HHC echoes the latter argument. After cataloguing the treatment Plaintiff received at BPW (*see* HHC Br. 9-12, 15-16), HHC argues that Plaintiff's allegations "merely describe a situation in which [Plaintiff] disagrees with the course of treatment provided," which, "[a]t most ... state[s] a claim for medical malpractice," but which "fall[s] well short of alleging that [HHC] acted with the requisite culpable state of mind" (HHC Br. 14, 16-17).

While Plaintiff's allegations as to the BPW Period may support a claim for negligence or medical malpractice, something Defendants acknowledge, the allegations do not support an inference of culpable recklessness in satisfaction of the subjective element of a deliberate indifference analysis. *See Santana* v. *Watson*, No. 13 Civ. 1549 (SAS), 2014 WL 1803308, at *5 (S.D.N.Y. May 6, 2014) ("[D]eliberate indifference is more substantial than mere disagreement

26

over a course of treatment, negligence[,] or even medical malpractice."); *cf. Brown* v. *McElroy*, 160 F. Supp. 2d 699, 706 (S.D.N.Y. 2001) (holding that "the fact that a plaintiff feels that more should have been done for his condition is not a sufficient basis for a deliberate indifference claim").

Unlike the allegations concerning the MDC Period, as to which Plaintiff alleges a total deprivation of medical care for his diabetes, the FAC describes the extensive medical care that Plaintiff received at BPW, including blood sugar level monitoring (FAC ¶ 87); insulin treatment (*id.* at ¶¶ 87-88); examinations of his foot condition (*id.* at ¶¶ 91-92); and treatment by multiple specialists, including two podiatrists, an endocrinologist, and a dermatologist (*id.* at ¶¶ 93-98). At bottom, the FAC alleges that this care was inadequate because it was characterized by delay, irregularity, misdiagnoses, and suboptimal treatment options, but these allegations do not rise to the level of a constitutional violation. *See Demata* v. *N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." (internal citations omitted)); *Sonds* v. *St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate

indifference."); *Williams* v. *Williams*, No. 13 Civ. 3154 (RA), 2015 WL 568842, at *7 (S.D.N.Y. Feb. 11, 2015) ("[A]llegations of a negligent misdiagnosis do not satisfy the subjective requirement of the deliberate indifference analysis because they do not suggest that the defendant acted with a conscious disregard to inmate health or safety.").

For example, in *Roberts* v. *C-73 Medical Director*, the diabetic inmate's claim for deliberate indifference was principally based on a treating physician's failure to stabilize his blood sugar levels with appropriate care and her denial of specialist care until his condition worsened and, even then, only on an infrequent basis. *See* No. 14 Civ. 5198 (GHW), 2015 WL 4253796, at *5-6 (S.D.N.Y. July 13, 2015). The Court held that while the inmate's poor physical condition at intake supported "an inference that a serious risk of harm existed," the allegations did not show that the physician "drew that inference and then consciously disregarded it." *Id.* "In fact, plaintiff acknowledges that when his condition worsened, [the physician] referred him to a specialist, which does not support a contention that she acted with deliberate indifference." *Id.*; *see also Roberts* v. *City of N.Y.*, No. 14 Civ. 5198 (GHW), 2016 WL 4146135, at *5 (S.D.N.Y. Aug. 2, 2016) (reaffirming reasoning and holding as to treating physician upon amended complaint).

By contrast, the court in *Colon* v. *County of Nassau*, found plausible claims of deliberate indifference where two diabetic inmates alleged that a physician denied them necessary, specified medical care because of budgetary constraints. *See* No. 12 Civ. 4466 (JS), 2014 WL 4904692, at *6 (E.D.N.Y.

28

Sept. 26, 2014). "If this is true and if the treatments at issue were medically necessary, this allegation could support a conclusion that [the named physician] was deliberately indifferent to [plaintiffs'] medical needs." *Id.* (citing *Liner* v. *Fischer*, No. 11 Civ. 6711 (PAC), 2013 WL 4405539, at *21 (S.D.N.Y. Aug. 7, 2013) (denying motion to dismiss deliberate indifference claim because "if, as plaintiff alleges, he was denied necessary medication for almost two years due to 'budget cuts,' this delay could potentially be a factor in support of a finding of deliberate indifference") (alterations omitted)).

Here, although Plaintiff's treatment during the BPW Period, based on the facts alleged, should have been more consistent, timely, and thorough, there is no indication that any of the treatment deficiencies were a result of "a conscious disregard of a substantial risk of serious harm" to Plaintiff. *See Estelle*, 429 U.S. at 105-06 (recognizing that "an inadvertent failure to provide adequate medical care," such as "a complaint that a physician has been negligent in diagnosing or treating a medical condition[,] does not state a valid claim of medical mistreatment under the Eighth Amendment").

### 2.   Plaintiff Has Failed to Plead Municipal Liability

#### a.   Applicable Law

Municipal entities may be sued directly for constitutional violations pursuant to § 1983, *see Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*, *see Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986). In other words, "*Monell* does not provide a separate cause of

action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal* v. *City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original) (citing *Monell*, 436 U.S. at 694).

A plaintiff may establish municipal liability under *Monell* in several ways, including by presenting evidence of "[i] an express policy or custom, [ii] an authorization of a policymaker of the unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a 'deliberate indifference' to the rights of its citizens, or [iv] a practice of the municipal employees that is 'so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials.'"  *Biswas* v. *City of N.Y.*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn* v. *Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)).

### b.   Plaintiff Allegations of Municipal Liability Are Inadequate

Plaintiff raises *Monell* claims against the City, Corizon, and HHC.  (*See* FAC ¶¶ 119-23).  HHC is a municipal corporation subject to municipal liability. *See Rookard* v. *Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (addressing HHC); S*ussman* v. *N.Y. City Health & Hosps. Corp.*, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at *7 n.3 (S.D.N.Y. June 16, 1997) (same). Corizon, although a private entity, is here treated as a municipal actor for purposes of *Monell*.  *See Bess* v. *City of N.Y.*, No. 11 Civ. 7604 (TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013) ("Corizon enjoys the benefit of the

*Monell* requirements for the same reason it may be named as a defendant in a
§ 1983 suit.  In providing medical care in prisons, Corizon performs a role
traditionally within the exclusive prerogative of the state and therefore, in this
context, is the functional equivalent of the municipality." (collecting cases));
*Law* v. *Corizon Med. Servs.*, No. 13 Civ. 5286 (KBF), 2014 WL 2111675, at *5
(S.D.N.Y. May 12, 2014) (same).

Plaintiff's claim against HHC presupposes the existence of an
independent constitutional violation arising during the BPW Period; because
this Court has found that none has been identified, Plaintiff's *Monell* claim is
dismissed as to HHC.  *See City of Los Angeles* v. *Heller*, 475 U.S. 796, 799
(1986) (recognizing that municipal liability requires that an individual
municipal agent committed an underlying constitutional deprivation); *Ferguson*
v. *Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12,
2012) ("Because the Court has concluded that [the plaintiff's] constitutional
rights have not been violated, his claim of municipal liability pursuant to
*Monell* is, *a fortiori*, also meritless.").

As to the MDC Period, and the municipal City Defendants, Plaintiff seeks
to establish *Monell* liability principally on the basis of (i) the City Defendants'
alleged official policies, including of prohibiting diabetic prisoners' insulin
pumps to be used or refilled while in custody and of prohibiting civilly
committed individuals to be admitted to the NIC infirmary (*see* Pl. Opp. 23;
FAC ¶¶ 125-26); (ii) the City Defendants' widespread practice and customs,
including of "failing to employ obvious measures to reduce the risk of abuses

alleged," failing to supervise adequately and train properly medical staff and corrections officers, and failing to ensure prompt and adequate medical services to inmates in compliance with the City's Minimal Standards for Health Care (*see* Pl. Opp. 24-25; *see generally* FAC ¶¶ 131-48); and (iii) the City Defendants' failure to train and supervise personnel, including "to ensure that they perform" duties related to inmate medical care "in strict accordance with [inmates'] civil rights and doctors' medical orders" and on how to handle difficult circumstances that are often presented (*see* Pl. Opp. 26-27; *see generally* FAC ¶¶ 119-48).

None of these allegations as pled is sufficient to state a claim for *Monell* liability against the municipal City Defendants. Plaintiff's allegations concerning the two official policies principally targeted — barring use of an insulin pump and precluding civilly confined inmates from receiving treatment at NIC — suffer from at least two defects. First, the FAC fails to plead facts showing that these policies caused the constitutional violation. *See Monell*, 436 U.S. at 693-94 (holding that municipal liability claim must allege that officially adopted policy or custom caused the constitutional violation); *see also Bd. of County Comm'r of Bryan County* v. *Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights"). Here, given the alternate medical treatments available, such as insulin shots or care at a different facility, the FAC fails to allege sufficient facts to plead a "direct causal link" between the alleged insulin pump or civil custody policies and the

constitutional violation here recognized, i.e., the total deprivation of medical care for Plaintiff's diabetes during the MDC Period.

Second, the "official policy" allegations lack sufficient factual detail. The FAC offers little beyond, "[Plaintiff] was told that he would not be allowed to continue using his insulin pump while in custody due to DOC policy" (FAC ¶ 69; *see id.* at ¶¶ 3, 125), and "DOC policy did not permit Plaintiff to be housed at [NIC]" because "Plaintiff was civilly confined" (*id.* at ¶ 73). "To state there is a policy does not make it so. And while a plaintiff need not assert the allegations in the initial complaint with a level of specificity only made possible through discovery," *Betts* v. *Shearman*, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at *16 (S.D.N.Y. Jan. 24, 2013), additional facts for Plaintiff's "official policy" *Monell* allegations are required. *Cf. Colon*, 2014 WL 4904692, at *10 (finding municipal liability adequately pled where complaint alleged that contract between municipality and medical provided subjected provider to a fixed budget that caused it to cut costs and that provider's policy "limit[ed] medication dispensing and prescribing to the facility formulary within the budget for the contract ... notwithstanding medical need").

Relatedly, Plaintiff's allegations concerning the City's (i) training and supervision failures, and (ii) widespread custom and practice of failing to ensure prompt and adequate medical services, a reduced risk of abuse, and the like, are inadequately pled. "[C]onclusory allegations that a municipality failed to train and supervise its employees [are] insufficient to state a *Monell* claim." *Davis* v. *City of N.Y.*, No. 07 Civ. 1395 (RPP), 2008 WL 2511734, at *5-6

(S.D.N.Y. June 19, 2008); *Connick* v. *Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").  Under the pleading requirements imposed by *Twombly* and *Iqbal*, Plaintiff must give a factual description of the injurious policy or custom, "not just bald allegations that such a thing existed." *Bess,* 2013 WL 1164919, at *2.

Here, Plaintiff's allegations consist essentially of a recitation of the inadequate medical treatment received and generic claims that such inadequacies were a product of harmful customs and practices or failures to train or supervise.  (*See generally* FAC ¶¶ 124-48; Pl. Opp. 23-27).  Such boilerplate allegations are insufficient to state a *Monell* claim.  *See Triano* v. *Town of Harrison*, 895 F. Supp. 2d 526, 535-37 (S.D.N.Y. 2012) (holding that "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details"); *Plair* v. *City of N.Y.,* 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (rejecting as inadequately pled the plaintiff's "conclusory" allegations that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality ... which constituted a municipal policy, practice or custom and led to plaintiff's assault" (alterations omitted)); *cf. Anderson* v. *City of N.Y.*, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights.").

Plaintiff's claim for failure to train (*see* Pl. Opp. 26-27), suffers from the additional pleading defect of nowhere identifying "[a] pattern of similar

constitutional violations by untrained employees," which is "ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks omitted).  Plaintiff identifies two examples of diabetic inmates dying due to DOC negligence in recent years (*see* Pl. Opp. 27), but nowhere details which deficient training program or manners of supervision caused the violations suffered by both Plaintiff and these other inmates.  Consequently, Plaintiff fails to plead adequately that the municipal City Defendants were aware that their training would fail to prevent the violations here suffered by Plaintiff.  *See Connick,* 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").  For all of these reasons, Plaintiff's *Monell* claims against the City, Corizon, and HHC are dismissed.

### 3.   The Court Dismisses Certain of the Claims Against Certain of the Individual Defendants

The FAC names John and Jane Does 1-25, "site directors, physicians, nurses, physician assistants, clinicians, therapists, and other medical staff … employed by the City, Corizon and/or HHC who were assigned to MDC and BPW on the subject dates and were responsible for the provision of appropriate medical care to patients at MDC and BPW, including Plaintiff, on said dates" (FAC ¶ 55); as well as John and Jane Does 26-50, "DOC officers, including but not limited to assistant deputy wardens, captains, and correction officers, between December 19, 2014[,] and January 14, 2015, who participated in

and/or had knowledge of and failed to protect Plaintiff from and/or intervene in the denial of timely and adequate medical care on those dates" (*id.* at ¶ 58).  As established above, the FAC plausibly pleads a deliberate indifference claim as to the MDC Period, but not as to the BPW Period.  Accordingly, Plaintiff's § 1983 claims are upheld as to the John and Jane Doe individual defendants responsible for Plaintiff's care at MDC and dismissed as to those responsible for Plaintiff's care at BPW.

The FAC also names five "senior officials" in their individual and official capacities: (i) DOC Commissioner Ponte; (ii) DOC Chief of Department, Martin Murphy; (iii) DOC Deputy Commissioner of Operations Dr. Errol Toulon, Jr.; (iv) MDC Warden Raleem Moses; and (v) BPW Deputy Warden Daniel O'Connell. (*See* FAC ¶¶ 44, 50-53).  Plaintiff's allegations regarding these senior officials boil down to the claim that "[t]hese supervisory officials knew or should have known that the pattern of abuse set forth in the [FAC] existed in their jails and hospital prison wards.  Their failure to take measures to curb this pattern of brutality constitutes acquiescence in the known unlawful behavior of their subordinates."  (Pl. Opp. 22).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon* v. *City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (collecting cases); *Johnson* v. *Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general

doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required."), *abrogated on other grounds by Graham* v. *Connor*, 490 U.S. 386, 393 (1989).  A court may consider supervisory personnel "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts.  *See Grullon*, 720 F.3d at 139 (citing *Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

Plaintiff's deliberate indifference claims have been dismissed as to the BPW Period; accordingly, there can be no supervisory liability for those claims. *Cf. Farid*, 593 F.3d at 249 (recognizing that a defendant's personal involvement in a constitutional deprivation is a prerequisite to a damages award under § 1983); *see Houston* v. *Schriro*, No. 11 Civ. 7374 (LAP), 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) (holding that there can be no supervisory liability for § 1983 claims that have been dismissed).

Turning to the MDC Period, the FAC fails to allege sufficient facts to plausibly demonstrate the personal involvement of the named supervisory officials.  The FAC merely recites the duties that inhere in each of the

supervisor's positions and attempts to bootstrap these responsibilities into generic claims of personal involvement.  *See Colon*, 58 F.3d at 874 (dismissing claim against DOCS Commissioner because "[t]he bare fact that [he] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim"); *Walker* v. *Schriro*, No. 11 Civ. 9299 (JPO), 2013 WL 1234930, at *15 (S.D.N.Y. Mar. 26, 2013) ("A defendant's status as warden or commissioner of a prison, standing alone, is ... insufficient to establish personal involvement under section 1983."); *id.* ("[P]roof of 'linkage in the prison chain of command' is insufficient." (quoting *Ayers* v. *Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985))); *see generally Ramrattan* v. *Fischer*, No. 13 Civ. 6890 (KPF), 2015 WL 3604242, at *9-10 (S.D.N.Y. June 9, 2015).

As discussed, the FAC fails to plead adequately any official policy, custom or practice, or deficient training or supervision, that led to the constitutional violation here recognized.  Likewise, the FAC fails to allege sufficient facts concerning which of these officials were responsible for creating which particular policies or customs, how they were grossly negligent in supervision, or in what specific manner they failed to act to prevent Plaintiff's injury.  Generic allegations that these officials "exercised policymaking, supervisory, and disciplinary authority on behalf of DOC," are insufficient to support a finding of supervisory liability.  *See Collins* v. *Goord*, 438 F. Supp. 2d 399, 420 (S.D.N.Y. 2006) (rejecting claims of supervisory liability against DOC Commissioner and prison superintendent because "entirely conclusory allegations" claimed that officials "were aware of and acquiesced to the

unlawful practices"). Accordingly, Plaintiff's claims against the named "senior official" defendants are dismissed.

### 4.    The Court Dismisses Certain of Plaintiff's State Law Claims

Plaintiff raises nine pendent state law claims in connection with his medical care during the MDC and BPW Periods. (*See generally* FAC ¶¶ 164-232). The City Defendants and HHC make no merits argument in favor of dismissing these claims. (*See* City Br. 20-21; HHC Br. 17). Rather, they presuppose the absence of a viable federal claim and argue exclusively that the Court should decline to exercise its supplemental jurisdiction. (*Id.*).

Having upheld Plaintiff's federal claim as to the MDC Period, the Court presently declines to dismiss the state law claims arising from the MDC Period. By contrast, having dismissed Plaintiff's federal claim as to the BPW Period, the Court exercises its discretion under 28 U.S.C. § 1367 to decline jurisdiction over Plaintiff's state-law claims for care received during the BPW Period. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013).

### 5.    Plaintiff Is Granted Leave to Amend in Part

Plaintiff requests leave to amend the FAC if the Court finds it deficient. (*See* Pl. Opp. 29). This request is granted in part and denied in part.

The Court has found that the FAC's allegations concerning the BPW Period fail to demonstrate "a conscious disregard of a substantial risk of serious harm," *Hill*, 657 F.3d at 123 (quoting *Chance*, 143 F.3d at 703), and thereby fail, as a matter of law, to state a valid claim for deliberate indifference

under the Eighth and Fourteenth Amendments.  In light of the Court's

reasoning, set forth *supra*, the Court finds that any effort to replead would be

futile and, thus, denies Plaintiff leave to amend the FAC with regard to the

BPW Period.  *See Foman* v. *Davis*, 371 U.S. 178, 182 (1962) (holding that leave

to amend should be "freely given," but not if amendment would be futile); *Ellis*

v. *Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to

amend a complaint need not be granted when amendment would be futile.").

Accordingly, all of Plaintiff's federal claims as to the BPW Period are dismissed

with prejudice.  *See Ferguson*, 2012 WL 2865474, at *6 (finding municipal

liability claim *a fortiori* meritless where no constitutional violation found);

*Houston*, 2014 WL 6694468, at *14 (applying same reasoning for supervisory

liability claim).  Plaintiff's state law claims based on the BPW Period are

dismissed without prejudice to their potential refiling in state court.

   With regard to the MDC Period, the Court has found that the FAC

plausibly pleads a claim for deliberate indifference in violation of the Eighth

and Fourteenth Amendments, but not for *Monell* or supervisory liability based

on that violation.  As currently pled, both of these theories of liability are

supported by insufficient facts and also suffer from serious defects related to

causation, e.g., that the deprivation of care here recognized to be a

constitutional violation was due to a specific policy, widespread practice or

custom, or training or supervision failures, *see Monell*, 436 U.S. at 693-94

(holding that municipal liability claim must allege that officially adopted policy

or custom caused the constitutional violation); *see also Bryan County*, 520 U.S.

at 403 (holding that plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights").  Nonetheless, because Plaintiff did not have the benefit of a pre-motion submission from the City Defendants before amending his original complaint (*see* Tr. of Nov. 17, 2016 Pre-Motion Conf., Dkt. #40, at 17:14-19; *see also* Dkt. #42), the Court grants Plaintiff leave to amend the FAC as to the MDC Period only.   In so doing, the Court expects that Plaintiff will take seriously the pleading deficiencies discussed in this Opinion, and will refrain from repleading these claims if those deficiencies cannot credibly be remedied.

Accordingly, Plaintiff's claims for the MDC Period against the municipal City Defendants (City, Corizon) and the named "senior official" Defendants (Ponte, Murphy, Toulon, and Moses) are dismissed without prejudice to replead; Plaintiff's claims against BPW Deputy Warden O'Connell are dismissed with prejudice.  Plaintiff's § 1983 claims are upheld as to the John and Jane Doe healthcare workers and DOC officers assigned to and responsible for Plaintiff's care at MDC.  (*See* FAC ¶¶ 55, 58).  Finally, as the City Defendants did not move to dismiss Plaintiff's state law claims based on the merits, those claims endure insofar as they arise from the MDC Period.

## CONCLUSION

For the foregoing reasons, the City Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, and HHC's motion to dismiss is GRANTED.  Plaintiff is permitted to file an amended complaint in accordance with this Opinion, if he wishes to, on or before December 22, 2016.  The City

Defendants can file an answer or other response within 21 days of the filing of the amended complaint.  Thereafter, the Court will schedule a pretrial conference in the matter.

     SO ORDERED.

Dated:     November 22, 2016
           New York, New York

                             _____
                                 KATHERINE POLK FAILLA
                           United States District Judge